Thank you, Your Honors. I'm Suzanne Luban, counsel for Mr. Hiley, the appellant. I'd like to reserve four minutes for rebuttal. I'd like to open with my argument one of the two arguments I've raised in my supplemental brief regarding jury unanimity. There are two jury unanimity issues. The first one is that I want to address is on which gun was the gun that was the predicate firearm for the 924C offense. And I point the Court's attention to a Rule 28J letter, which I brought today, citing two cases, a Third Circuit case and a Fifth Circuit case, which describe a case-by-case analysis as to whether a unanimity instruction is necessary. And basically, what those courts say is that it doesn't matter unless it matters. And if it matters, then the jury needs to be instructed on unanimity and there needs to be a special verdict. And the Alerta case, the Ninth Circuit case involving numerous guns, including a machine gun, which held that, in that case, it mattered which gun because of the 30-year penalty under 924C, that's just a specific really a specific application of this case-by-case rule, that it doesn't matter unless it makes a difference. In this case, it matters which of the guns, because there was no evidence that Mr. Hiley and the government concedes that Mr. Hiley did not hold the gun that was in the lobby. The gentleman that was in the lobby was not Mr. Hiley. And, in fact, on page 12 of the government's brief, supplemental brief, the government says the evidence supported that defendant was one of the two men who jumped over the counter. And going on into the next page, the government says Mr. Hiley was just an aider and abetter of one of the guns and held no gun. And because of that possibility, that very distinct possibility in this case, that was the brunt of the evidence, supported that Mr. Hiley jumped over the counter and was not the individual who was holding a gun who robbed Mrs. Gepetti. Well, if he is not the individual holding the gun behind the counter and he's not the individual holding the gun in the lobby, is his relationship to those two guns any different? Yes. I submit that it is. And that is because there is insufficient evidence to show that Mr. Hiley aided and abetted the use of either of those guns. And that's the question. Well, then it doesn't matter, does it? I mean, if he's not the individual holding the gun. Well, if he could have been the man who held the gun, he could have been the man who held the gun. Well, then there's a possibility that he could have been the man who held the gun.  Now, if he was the man who held the gun, then he could have relied on both, isn't it? I mean, another one. Why would a jury say, well, he aided and abetted this one because he was one foot closer to that gun than he was to the other gun. Wouldn't they – wouldn't the jury say he either aided and abetted the use of both guns or neither? One witness testified that all the men had guns. Now, the government didn't argue strongly that that witness was accurate, but that was a possibility the jury could have relied on conceivably. And the jury could have found, as the government argued, the government argued that he was the man or likely could have been the man who robbed Mrs. Gepetti who had a gun. The evidence that he wasn't that person had to do with the color of the bag which robber carried and that my client had a southern accent or, you know, because he came from Louisiana. So there wasn't actual proof as to which man behind the counter my client was, we argued, and I think the jury could have found that he was simply aiding and abetting based, in part, on their question, demonstrating their concern about – that they were focusing on aiding and abetting. So then comes the issue of is there insufficient evidence of aiding and abetting any gun? And this, of course, segues into the unanimity as to whether he was a principal or an aider and abetter. And if you look at United States v. Nelson and the 924C case, Ban Kalari, that is cited in Nelson, talks about that it's not only necessary that the individual, the aider and abetter, have foreknowledge that a gun will be used, but they have to take action to facilitate or encourage the use of that gun. There's no evidence in this case that my client facilitated the use of any of the guns or encouraged or took action to make the – and really, there's no evidence that he knew the guns were going to be there. He was just sort of hanging around the felony? Your Honor, he was one of the robbers. He put money in a bag. He confessed to that. And that evidence was before the jury. Do you have any cases where somebody was a participant in the armed robbery but didn't carry the gun and was not – was held not to be an aider and abetter? Well, Your Honor, that's the case of United States v. Nelson, where they say, well, she participated in planning the robbery, and she did not counsel or encourage the use of the gun in particular. While she participated in the robbery, knowing a gun would be used, she took no action at the scene of the crime that encouraged or facilitated the use of the gun. Yeah. I guess I was sorry in reading the Nelson opinion that it didn't make terribly clear just what his participation was. Well, there – in Nelson, there were three defendants.  We have a female defendant who they found there was no evidence that she actively facilitated the use of the gun, whereas the other two defendants did actively facilitate. And there have been cases, perhaps, where somebody is driving a getaway car and doesn't – says he doesn't even know a gun was used. He didn't know, or they were just going to go in and threaten. Well, Your Honor, I think this Nelson case is very instructive because it counter – it compares the behavior of the defendants in that case who did, and it gives examples of what it was that they actively did to encourage the use of the gun. One guy called out to all the people in the lobby or wherever it was, I think it was a jewelry store, to get down so that the man with the gun could enter safely. And that was considered to be active facilitation, whereas this woman, who was not found to actively facilitate, she was just, you know, robbing the jewelry store and taking jewelry. You had a day's work robbing the store. Just like Mr. Hiley. Well, yeah, I tried this case, Your Honor, and I did argue to the jury that my client was one of the robbers. So we didn't deny that. But in this case, the jury – there was a likelihood of juror confusion specifically because of that. And there was prejudice because the jury could have relied on the gun that there was no basis for finding liability because of the insufficiency of the evidence. Now, the same goes for the unanimity on whether my client was an aider, an abetter, or a principal as to counts two and three. And the same – I argue that the same approach should apply, that the Court should look at it and decide whether it matters. And in this case, because there's insufficient evidence that my client aided and embedded by actively facilitating the use of either of the guns, which is very distinctively separate from actively facilitating the robbery. And these cases very clearly say that you have to facilitate the use of the gun. It's a separate offense, not just a sentencing enhancement. And so, therefore, unanimity should have been required. And, again, in this situation, it is prejudicial to my client because he couldn't have been convicted otherwise. Now, the government argued its main argument was the team theory, that my client was just one of the people in the robbery and that his just being in the robbery facilitated the other use of the gun. But there was no evidence of any action that he took. So the – these cases reject that team theory. What action would he have taken to support the use of a gun, other than what he did? Well, in one of these cases, one of the individuals – I think it's in Nelson – one of the individuals actually held the gun and was going to carry it, and then at the last minute, I think, handed it to the other guy. And like I said earlier, he – one of them argued that – one of them yelled out to the people to get on the floor as the man with the gun entered, which facilitated his safe entry. Jumping over the counter and gathering up all of the cash, how did he think all these people were being quiet and not doing anything and allowing him to rob the bank? Using the gun facilitated my client jumping over the counter. I think that is clear. But the reverse must be true. My client didn't use the gun to facilitate somebody else's action. He did the action that you're just – I think correctly describing was facilitated by the man in the lobby. So the man in the lobby should get the extra hit for the gun charge on his sentence, but not my client. My client is lesser – is less culpable because he did not use a gun. So he's able to complete the robbery because he's got somebody holding the gun, but you said, well, that was just news to him. He didn't know anything about that. Well, Your Honor, I don't know that it was news to him. There was not evidence that he knew about it, and the government has the burden, and the government has the burden of proving that he actively facilitated, that he took some action. So I'd like to – I'll next talk about the suppression motion. And to be clear, I am challenging the fruits of the warrantless arrest of my client, not the search of the – of the house. And so the main fruits of that arrest were his statements, his post-arrest confession, and his shoes, which matched the prints on the counter. You're going to argue there was not probable cause for the arrest of your client? Right. Particularized probable cause – individualized probable cause as to him. As to him. As to him. That's right. That's my first point. I'm also going to be arguing about exigent circumstances. There's no question that the police learned through investigation that the robbers were in the immediate neighborhood of where they found the tracking device, the car, and one other piece of evidence, the keys to the rental car that was left in San Jose. What do we mean by immediate neighborhood? Maybe you're going to get to that in your – I went there, and I – there was – there were posters shown to the jury, and it's a – there's a huge boulevard. That's the street that the apartment house was on. And then there was a house and a – and a yard, and then a little cross street, residential street, and a whole network of very close-together blocks of residential streets filled with little houses. And then that big boulevard is filled with apartments. It's a very densely populated area. This is just like the case where they watch the man run into a hotel, and they don't know which room in the hotel he goes into. The robbers are somewhere in this very densely populated neighborhood, which is the neighborhood with a lot of African-American residents, including the other man who the police stopped on the street. So they just randomly picked the only two men that they saw in the immediate area, which is within a block of the transponder device, stopped them both, and determined – the officer testified that they just thought it was more likely that the robber was Mr. Grimes rather than this other gentleman, Terry King, who they – The fellow without the shirt was being one of the robbers? Well, that's – Other than the fact that he didn't have a shirt on, it was a cold night, or – It wasn't night. It was day, and it wasn't – it was – you know, the Bay Area winter isn't that cold. Yeah. It did rain later in the day, but again, it was not a very cold day. He was jogging, and he had a startled look on his face. That's what the officer said. He actually used a different word in his declaration. But I think that it is well known that in Oakland, when approached by police officers, young black men have a right probably to have a startled look on their face or a frightened look on their face, and I don't think that's a probable cause to differentiate him from another individual who – they didn't say what his face looked like, but they detained him for several hours as well. And they said that he was near these items of evidence, which he was equidistant from the items as the other guy, the other individual. So they could have – and they didn't learn anything more from him that connected him to the robbery when they questioned him. They did not find out that he was the robber. They just found out where he lived. And they determined – because they determined it was him, based on what I think was a very good police hunch, but a hunch does not make probable cause, they zeroed in on this house, on this apartment building, and surrounded the apartment building and ordered the individuals out, which the government has conceded. Was the transponder found very close to where they first encountered this individual? It was in the backyard of the lot that is, I guess, adjacent to or some – or near this Little Cross Street. And so, although he was – I think the description was – I read them both again. They were both – one was on 94th – I think it's 94th Avenue, which is the Little Street, and the other one was on Sunnyside, which is the Little Cross Street. And those were about the same size streets, and they were approximately the same distance, coming both in the same direction of it, but – I think they were in the same direction of it, but not anywhere necessarily closer. And the officer would have written that in his report if that was the reason. I think they determined because he was younger, he was more likely the robber, although that's not written in the report. But of course – It is correct that the transponder was found close to where they encountered Issaac Givens? Grimes? Grimes. Excuse me. Grimes. Yes. He was near there, as was Terry King. And so they detained both of them on instructions of the officer who was following the transponder. So it didn't have to necessarily be them. It could have easily been someone who was in another house. They happened to be on the street. But as I said, this is a densely populated area. People could have dashed in. They were not – and then this leads me to my next point. What did they find as a result of the arrest that they would not have found in the consensual search? My client's confession, which the government kind of unbelievably to me argues was not prejudicial and was merely cumulative. I think that it's clear that where the individual confesses to every detailed aspect of the crime, which is supported by evidence that has been shown by the government in terms of where the car was left, what kind of car was driven, that clearly that cannot be considered to be just cumulative, that he would just simply have been an individual. He lived. He lived part-time in that apartment. He had a reason to be there. He could have been there when the robbers came home, if in fact they're really the robbers and they come home and he sees that they have all this money and all this stuff. He could have also been found by the jury to have been the driver. And if he was found to have been the driver, then he would have been acquitted of the 924C. So there were a couple of different reasons why. You know, it seems to me that if the police had probable cause to believe, if there were maybe a reasonable cause to believe, that Apartment 6 held the robbers of the bank, that the robbers of this bank were in Apartment 6. If they had reasonable cause to believe that, their probable cause to believe that, then they make the in-house arrest, in effect. You do agree it was an in-house arrest. The government concedes that as well. When they order them out, it's the same thing as if they came in. But the question in my mind is just what those facts were that established the probable cause to believe that the robbers of the bank were in Apartment 6. What I understand from the reports and from the government's position, it's that he's near the device and the keys and the Tahoe, that he – but no one sees him drop those items. He gives a startled look, and he was no – is wearing no shirt and no shoes, and is jogging. And those facts, I submit, do not support a finding that he – a probable cause that he was the robber. And so why necessarily – Jogging without shoes? Yes. He was running without shoes. There are a lot of famous – all the people who win the beta breakers every year. Robert Bacali won the Olympic marathon without shoes, but it's pretty unusual. Does it mean he's the bank robber, though? I mean, that – you know, that's – is it unusual enough that – No. I understand your point. And they don't just stop him. He's not the only person they stop. They randomly – if there had been 10 black men in the immediate area, I think they would have stopped them all. You're under four minutes. You wanted to save some time for rebuttal? Yes. I just wanted to say one more thing, though, about the exigent circumstances. The cases on exigent circumstances say that they have to – there has to be continuous awareness of the location of the suspect. And in this case, instead of that, they found the residents by investigation, which is clearly breaks the chain of events, breaks the pursuit, and so there was no hot pursuit as well. Thank you. Thank you. Counsel? May it please the Court, here's an alt for the United States. I'd like to address counsel's arguments in order. The first argument that she made referred to specific unanimity and led into the aiding and abetting issue at trial. There was no need for specific unanimity instruction in this case because the defendant was guilty no matter what theory, aiding and abetting, or as a principal, and no matter whether he had a gun or not. There was sufficient – so there was sufficient evidence to support the jury's verdict, and that's what we're talking about here is whether we're going to overturn the jury's guilty verdict. If the defendant was the man in the lobby, he had a gun, and he clearly used that gun to rob the bank, and they were all masked, which is why we don't know which one was the defendant. If he was the robber behind the counter who was standing next to Connie Gepetti, the third man pointed a gun at her and told her to turn around before taking the money. If he was that man, he's also guilty as a principal. Then there was the third man, the third man who was next to Sherita Grimes. Sherita Grimes said that the men came into the bank. She ducked down right next to her cash can, which was right next to her. And the man came over and ordered her to open up her cash can, and then – and she opened up the bottom one, and she couldn't open up the top one. Under Nelson, which I think we can agree is a problematic case here, Nelson found that the woman who participated in those robberies, her name was Edwards, that Edwards was guilty as an aider and abetter of a 924C for one robbery, but not for the other. They found that she was guilty as an aider and abetter in the July 11th robbery because in that robbery, she had ordered people in the bank to get down before the person with the gun came in. And so she had facilitated that person's use of the gun by making it safe for him to enter by giving that command. The Court also found that another of the bank robbers, by giving a command for people to get down under the protection of the gun, had served as an aider and abetter. Then the Court found that Edwards was not guilty of aiding and abetting the use of the gun on the August 12th robbery because she didn't say anything. That is an odd distinction, but it's a distinction that they made. In this case, each and every one of those robbers ordered people in the bank to do something that was enforced by one or two guns that were in the bank. So under Nelson, everybody in that bank is guilty of aiding and abetting. The evidence of foreknowledge was just what? His confession that he engaged in the planning, did he say in his confession that he helped plan? Yes, Your Honor. He said two things in his confession. He said that he helped in the planning of the robbery, and he also admitted that his fingerprints might be found on the gun because he had held the gun and looked at it and held it so that his fingers would be in this position on the gun before the robbery. So from that, we believe that because of the type of robbery it was, it was an armed takeover robbery of a bank in the middle of the day, and he participated in planning it, we believe the jury could have inferred that he participated in planning an armed bank robbery using a gun, and that by holding and handling the gun ahead of time, they could have inferred that he knew that the gun was going to be used and that the planning involved his use of the gun. Okay. The bank staff person who ducked down when they came in, what was her name? Her name was Sherita Grimes, and her testimony can be found in the government's supplemental excerpts. I just had a question. She related to the Grimes they encountered on the street? Oh, no. Actually, I'm sorry. Her name is not Sherita Grimes. Her name is Jeanine Grimes, and no, she's not. Okay. And a final point on this issue of who was aiding and abetting whom. If the defendant had not taken money out of the cash cans, then the robber who was in the lobby, if he was the only person with a gun, would have just been standing there waving a gun around. There would have been no point to him doing that. Everybody in that robbery was essential to completing the robbery. Everybody there performed a vital role, and everybody there aided and abetted everybody else's participation. So we submit that under the facts of this case, they were all guilty as either a principal or an aider and abetter, and the jury's verdict should be upheld. Now, on the motion to suppress, I believe this Court had a number of questions. One, I can – a factual question I can just answer right away. Philip Grimes was approximately 25 feet away from the tracker when Officer Wong saw him. He was 25 feet away from the what? Away from the tracking device. Yeah. Okay. When Officer Wong first saw him. So he was very close. Mr. King was right across the street from where the tracking device was. So both of them were very close. The officers did stop Mr. King, as they had, I believe, a responsibility to do, to find out either whether he was involved in the robbery or whether he'd seen anything that might help them out. He could have been a witness and seen the robbers running somewhere. As soon as they ascertained that he was not involved in the robbery, they let him go. They did not do the same thing with Philip Grimes for many reasons. They knew the tracker. They had a handheld device that showed them that the tracker was in the immediate area. The tracker had been moving. They had been following a moving tracker. They had traced it from San Jose to Hayward to Oakland. It had been moving along the way and now it was stopped. So they knew that the robbers had been running and now they were stopped. And they knew that that. But how did they know the robbers had stopped? Maybe the robbers are still running. Because the signal that they had been getting from the, well, they knew that the tracking device had stopped. Yeah. They knew it was there. The other thing that they knew was that it takes approximately an hour to get from San Jose to Oakland. And the robbery had occurred at 10.50 in the morning. And it was now 11.45. So they knew that even driving very, very quickly, the robbers had just enough time to get to where that tracking device was. So they had to have just arrived or had arrived very soon afterwards. They saw Philip Grimes and it was cold outside. Officer Wong testified that it was cold enough that he was wearing his heavy police jacket and gloves. And they see somebody walking down the street very quickly, jogging, running, without a shirt and without shoes on. And these bank robbers were all wearing dark clothing, dark pants, dark shirts, gloves, and ski masks, things that were very – would have been very suspicious if you had seen them walking down the street wearing these clothes in the middle of the day. So it was logical for the officers to assume one of the first things they would do is So the fact that this person wasn't wearing normal street clothing was suspicious. He looked nervous. And so they detained him to ask him a few questions. One of the questions they asked him was, where do you live? And he told them that he lived in Apartment 5. They found out soon thereafter that he didn't live in Apartment 5 because Apartment 5 was vacant. They found out that he actually lived in Apartment 6. So he had given them false information about where he lived, which added into their probable cause calculation. Then they also found the tracker, which was in a yard right behind the building where Philip Grimes stayed, 9329 Bancroft. And there was a path that connected those two buildings. They knew that he was headed back towards 9329 Bancroft, away from the tracker and back towards that building when they found him. They also found the second getaway car right on that street corner next to the building. They found that second getaway car. The hood was still warm, so they knew it had just gotten there. Evidence of the bank robbery was in plain view inside the car. And the car keys to the first getaway car were right there. So unlike the Windsor case, which is where they ---- What did they know about the cars at the time that they found that? What did they know about? They knew what? That the white car had driven them away from the bank, probably. Yes, Your Honor. The police knew that. Did they know about the switch to that big van? Yes, Your Honor, because they found they had canvassed the area around where the white car was. And they found a business that had video surveillance out towards the street. And they reviewed the video surveillance for the time after the robbery, and they saw ---- They had done all this before they encountered the man on the street? No, Your Honor. This information is information that would have been coming in to them as they were conducting their investigation. Okay, but at the time they made the arrest, they didn't know anything about the car. Is that right? It's unclear from the record what they knew about the cars at the time they made the arrest. They knew there was a blue car with a warm hood somewhere around. But there's no reason for them to know that the blue van was used in the robbery at that time. Your Honor, they may have known. It's simply not clear from the record whether they knew or not. They did see on the video surveillance that a dark-colored SUV had left the area where the white car was found. Yes, but that all came later. They saw that video later, apparently. Is that right? It's not clear, Your Honor, because it did take them ---- The robbery occurred at 10.50 in the morning. When they saw Philip Grimes, it was approximately 11.55 in the morning. So it was an hour later. It's entirely possible they could have seen that video. They could have known at that time that they were looking for a dark-colored SUV. But it's just not clear from the record. There's not a lot of time stamps on what the police were doing. So the officers could have stopped Philip Grimes under reasonable suspicion. They very clearly had reasonable suspicion. We argue that they had probable cause when they stopped him to detain him to determine whether he was involved in the robbery. It is clear that at some point that reasonable suspicion does develop into probable cause as they find all of these other things that connect him and the location to the robbery. And they connect him to the robbery. And they connect him to Apartment 6. And then, while taking steps to secure the area, they evacuate the building. They know that the robbers aren't in any of the other apartments. They know that Apartment 6 is occupied. And they know that the people in Apartment 6 are not coming out. In spite of the visible police presence, in spite of commands to come out, they're not coming out. And so they have probable cause to believe that those people are the bank robbers. How many apartments were there in the building? Do you know? There were eight apartments in the building. One of them we know was not occupied because that was Apartment 5. So there were seven. It's a two-story building, is it? It was a two-story building, yes, sir. Okay. With all of the apartments facing the street. And then there's a window that's facing the street and a window that's facing the back. Okay. So the cops zero in on Apartment 6 when the fellow without the shirt, when they finally figure out that's sort of fun, they learn rather quickly from the sister, I guess his sister. They learned from the apartment manager that the apartment that he had given, the number he had given, number 5, was not occupied. They then searched the police records, and Philip Grimes is in their database. And he has given Apartment 6 as his apartment to the police in the past. Then Sherita Grimes shows up and informs the police that, in fact, Philip Grimes does stay with her on occasion. And he was there the night before. So at that point, they're probably thinking, these guys are associated with a shirtless, shoeless runner. And so they're probably in 6. Let's get everybody out of that building and see if they come out or see who comes out of 6 or whatever. Anyway, they ask everybody, tell everybody to get out of the apartment building, and nobody gets out of Apartment 6. That's the only one other than the unoccupied that is not vacated. Is that right? That is right, Your Honor. And at the time that they vacated the other apartments, they did believe that the robbers were in Apartment 6. Yes. Because they had probable cause to believe that Philip Grimes was one of the robbers and that he had come from that apartment. They did not know whether the apartment was still occupied. However, that fact developed as the course of the investigation developed when they saw people in the apartment through the back window. The window and the facts are not fully developed, but that window was covered by a blanket, and they saw the people through the window implying that the blanket was moved aside and then put back. So the police also had reason to believe that the people in the apartment knew that they were there for several reasons. There was a visible police, a strong visible police presence in the area. They knew they'd taken a tracker with them back to their hideout, and they knew that they'd sent Philip Grimes out to go get the tracker, and he didn't come back. This Court has found in the past that sending, for example, a drug courier out with drugs, and if he doesn't come back, there's reason to believe that that supplier, whoever sent that person out, can believe that that person was picked up by the police, and the police are now surrounding the area. And this creates an exigency, as this Court has recognized in the past. If you have armed bank robbers with a gun, they haven't found a gun yet, any guns along the getaway route, although they've found other things, holed up in an apartment surrounded by the police, there's a danger, both to the police and to the community. And the police have the right to do what they need to do to protect themselves and the community. In this case, they did not go bursting into the apartment immediately with their guns drawn, creating a dangerous situation. They surrounded the building, cleared the neighborhood, and talked the robbers into coming out of the apartment. And we submit that this is a reasonable and appropriate response to the situation. There was an exigency. They could have come in. They could have gone into the apartment right away, either based on Charita Grimes' consent or the exigencies of the situation. They didn't. Instead, they chose to take a prudent and safe course of action, which was to talk the robbers out of the building. Robbers come out of the building, and they're arrested. Hours later, at 6.30 at night, the defendant confesses. And — Kennedy. Is there any — have you ever heard of a doctrine of inevitable discovery to support an arrest? No, Your Honor, although I suppose — I mean, there's a consensual — you've got consent to search. You found ski masks and things in the room. You'd have found those eventually anyway. I've never heard of the doctrine, either, but I'm just curious to know. I haven't heard it applied to this situation, although the Court did ask what the government would have gotten out of it. What the government got, through the methods that it used, that it would not have gotten had it entered the apartment under Charita Grimes' consent. And the answer to that question is nothing. If the officers had gone into the apartment and arrested the defendant with Charita Grimes' consent, he still would have confessed, and they still would have gotten his shoes during the search incident to arrest. But the consent to enter the apartment didn't add to the probable cause that he was a robber. The bank did it. However, this goes to Judge Canby's inevitable discovery argument. Had they entered the apartment under Charita Grimes' consent, they could have detained the people who were in the apartment while they were searching the apartment. They would have found three people matching the descriptions of the robber surrounded by evidence of the crime. I got you. So at that point, they clearly would have had probable cause if they did not have it already, which we submit that they did. So, Your Honor, this is a case where we believe the police did everything right. They had probable cause to believe that the bank robbers were in a particular place. They didn't go bursting into that place right away. Instead, they took steps to strengthen their probable cause, develop their case even further, protect the safety of the community, and talk the robbers out of the building before arresting them. And there was no Fourth Amendment violation here. The district court properly denied the motion to suppress. The jury's verdict was supported by substantial evidence of the defendant's guilt. And we believe that the district court's ruling and the jury's verdict should be affirmed. I have a couple more questions, a couple more minutes if there are any questions. I don't see any. Thank you, counsel, for your argument. Thank you. Rebuttal. First, I'd like to direct the Court to the government's very helpful supplemental excerpts of record, pages 237 and about 5 or 10 pages after that, which contains the timeline that was prepared by one of the officers on the scene. So it tells what happened at each time in the day and shows that they called out and they called out at 1503, which I believe is 303, which is several hours after they began to undertake this investigation and to hide snipers on rooftops and to evacuate the building. And by the way, the building does not, all the apartments in the building do not face the street. It's a long, skinny building, and only the front apartment faces this. Well, the top, the top apartments face the street. And all the other apartments, including this apartment, face a wall or a fence that is the next door. And it's a little alley, and they could not necessarily see the police. There's no indication that the police were in plain view. In fact, they kept everybody back, and they made a very wide perimeter, and there were no police cars nearby to the apartment. The prosecutor says that as soon as they found out that Terry King was not involved, they let him go. We sent an investigator to talk to Terry King, and he was held for several hours in a police car during this entire process. So that's completely incorrect. Now, in order to get by the warrant requirement, in exigent circumstance, as a justification, they have to have not had time to get a warrant. In this case, they had time to bring on and set up a huge tactical center a few blocks away, bring in FBI agents that were – they enlist all the sergeants and all the detectives and all the teams that were here. They had snipers placed. There were two U.S. attorneys who were coming back and forth who were available to approve a telephone or written warrant during that time period. They had time to get the Water and Power Department to turn off the water. They had tons of time that they could have used to get a warrant in this case. And instead, they chose not to and to just pursue what they were doing to basically get these people out and follow up on their hunch, because they knew that they could not justify – or who knows, maybe it's – but I would submit that they could not justify to a court that why they – For what? Persons unknown in Room 6? Right. Right. And just – and they already could search because they had the consent. So really, it would have been persons unknown in Room 6, which we think are connected to a guy who was barefoot on the street in the vicinity of evidence of a bank robbery. And Your Honor's point is well taken. They jettisoned one tracker in San Jose and kept going. So they weren't entitled to search all the homes in the neighborhood where that guy was and all the people on the street there. They could have checked – chucked out the window, that tracker, and headed out into their next rental car and on the next – you know, on the way. And as to the inevitable discovery argument, the government argued in its brief also that it was a protective suite pursuant to the consent. That is all bootstrapping. The officers ordered those men out so they could arrest them, not so they could search, and took my client's shoes at the facility where he was questioned. He was interrogated pursuant to his arrest, and therefore all of the evidence that I seek to exclude was pursuant to the arrest, was a fruit of the arrest. Thank you. Thank both counsel for their arguments. The case just argued will be submitted.
judges: Canby, Thompson, Hawkins